UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARK EVERETT STOREY,

                    Petitioner,

                                         CASE NO. 06-CV-13194
v.                                       HONORABLE JOHN CORBETT O'MEARA

DOUGLAS VASBINDER,

                    Respondent.
_____/

## OPINION AND ORDER GRANTING PETITIONER'S MOTION FOR RECONSIDERATION AND DENYING THE HABEAS CORPUS PETITION

Petitioner Mark Everett Storey has filed an application for the writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  This is Petitioner's second habeas corpus petition challenging his

1986 convictions for first-degree (felony) murder and possession of a firearm during the

commission of a felony (felony firearm).  The Court granted Petitioner's first habeas petition and

awarded him a new appeal of right.  Following an unsuccessful appeal in state court, Petitioner

filed the pending habeas corpus petition, which was randomly assigned to the Honorable Paul D.

Borman.  Upon reassignment of the case from Judge Borman to this Court, the Court determined

that some of Petitioner's claims could have been raised in his first petition.  Accordingly, the

Court ordered Petitioner to delete what the Court perceived to be second or successive claims or

to apply to the Court of Appeals for authorization to have this Court consider all his claims.

Petitioner argues in a motion for reconsideration that the Court misconstrued the facts and

misread the law.

There is a difference of opinion on the extent to which a habeas petition that resulted in a

new appeal of right renders a subsequent habeas petition a second or successive petition, and the

United States Court of Appeals for the Sixth Circuit has not addressed the issue.  Consequently,

Respondent's motion for reconsideration or a rehearing [Dkt. #31, June 18, 2009] is

**GRANTED**.  The Court will proceed to address all of Petitioner's claims on the merits.

# I.  BACKGROUND

### A.  Petitioner's Conviction, Direct Appeal, and State Collateral Proceedings

Petitioner was charged in Wayne County, Michigan with first-degree  murder and felony

firearm.  The charges arose from the fatal shooting of Nathan Wilson, who was twenty years old

at the time of his death.   As explained by Michigan Court of Appeals,

> Nathan Wilson worked in Detroit at the Gold Mine jewelry store ("the shop").
> On November 7, 1984, he was found dead in his chair behind the counter in the
> shop. The employee area behind the counter was separated from the customer
> area by a Plexiglas partition and a sliding steel door.  The owner, James Floyd,
> determined that gold, cash, and a handgun were missing.
>
> Defendant's fingerprint was found on the telephone behind the counter, and he
> claimed that he was there to sell some stolen jewelry.  Floyd testified that two
> weeks after the robbery and murder, defendant sold him a gold necklace that had
> been stolen during the robbery.  At trial, Darin Henderson and David Kidd
> testified that defendant had told them that Wilson would be an easy target to kill
> and rob.  Henderson wrote Floyd a letter implicating defendant, Shawn Coats, and
> Anthony Whitlow, and he testified that he witnessed the robbery and murder.
> Henderson, Kidd, and William Walls testified that defendant admitted to them
> that he had participated in the robbery and murder.

*People v. Storey*, No. 251271, 2005 WL 711756, at *1 (Mich. Ct. App. Mar. 29, 2005).[1]

Following a bench trial in 1986, Petitioner was found guilty, as charged, of first-degree

murder, MICH. COMP. LAWS § 750.316(1)(b), and felony firearm, MICH. COMP. LAWS §

---

[1]  The testimony at trial was explained in more detail in this Court's Opinion and Order
granting Petitioner's first habeas petition.  *See* the Appendix to this opinion.

750.227b.  The trial judge, Detroit Recorder's Court Judge James R. Chylinski, sentenced Petitioner to two years in prison for the felony firearm conviction and to a consecutive term of life imprisonment for the murder.

Petitioner challenged the sufficiency of the evidence in a direct appeal from his convictions.  The Michigan Court of Appeals affirmed his convictions, *see People v. Storey*, No. 95793 (Mich. Ct. App. Apr. 11, 1988), and on October 31, 1988, the Michigan Supreme Court denied leave to appeal.  *See People v. Storey*, No. 83227 (Mich. Sup. Ct. Oct. 31, 1988).

On or about March 31, 1989, Petitioner filed a state complaint for the writ of habeas corpus in which he set forth several claims, including an allegation that trial counsel was ineffective for failing to investigate and obtain discovery.  Judge Chylinski declined to hold an evidentiary hearing on Petitioner's claims and denied the complaint.

Next, Petitioner filed a motion for relief from judgment, alleging ineffective assistance of trial counsel.  The trial court's successor, Harvey F. Tennen, held an evidentiary hearing at which a criminal defense attorney testified as an expert witness and opined that Petitioner's trial attorney was ineffective.[2]  Judge Tennen then granted Petitioner a new trial.  The State appealed Judge Tennen's decision, and Petitioner cross-appealed.  The Michigan Court of Appeals remanded the case for a determination on whether Petitioner had shown "cause" for not raising his claims on appeal.  *See People v. Storey*, No. 182285 (Mich. Ct. App. Feb. 16, 1995).

On remand, Judge Tennen vacated his order granting a new trial and denied Petitioner's motion for relief from judgment after concluding that Petitioner had failed to show "good cause" for not raising his ineffectiveness claim in his appeal of right.  The Michigan Court of Appeals

---

[2]  Petitioner's trial attorney was deceased by the time of the hearing.

3

and Michigan Supreme Court denied Petitioner's applications for leave to appeal Judge Tennen's ruling. *See People v. Storey*, No. 184371 (Mich. Ct. App. May 23, 1995); *People v. Storey*, No. 103296-7 (Mich. Sup. Ct. Mar. 26, 1996).[3]

On April 22, 1997, Petitioner filed another motion for relief from judgment. He asserted several claims, including a claim that key witnesses perjured themselves at his trial. Judge Tennen held a lengthy evidentiary hearing at which prosecution witnesses David Kidd and Darin Henderson recanted their trial testimony. A new witness, Myron Nelson, testified at the hearing that he saw the three men leaving the Gold Mine on the date in question and that they were taller and darker complected than Petitioner. Judge Tennen denied Petitioner's motion for relief from judgment after concluding that the recanting witnesses were not credible and that the new evidence, even if admissible, would not have produced a different result at trial. Judge Tennen found no merit in Petitioner's claims regarding his former appellate attorney, evidence of his criminal activity, the prosecutor's conduct, and the right to confront witnesses. The Michigan Court of Appeals and the Michigan Supreme Court denied Petitioner's subsequent applications for leave to appeal. *See People v. Storey*, No. 229725 (Mich. Ct. App. Nov. 9, 2000); *People v. Storey*, No. 118290 (Mich. Sup. Ct. Oct. 29, 2001).

**B. The First Habeas Petition and Subsequent State Appeal.**

On October 29, 2001, Petitioner filed his first federal habeas corpus petition, raising eight claims. This Court granted a conditional writ of habeas corpus on Petitioner's claim of ineffective assistance of appellate counsel. *See Storey v. Price*, No. 01-74092 (E.D. Mich. Sept. 18, 2003). Petitioner's claim of appeal was then reinstated, and he was permitted to file a motion

---

[3] Justices Michael F. Cavanagh and Conrad L. Mallett, Jr. voted to grant leave to appeal.

4

for new trial. Wayne County Circuit Judge Michael M. Hathaway denied Petitioner's motion for

new trial, and the Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished

opinion on March 29, 2005. *See Storey*, 2005 WL 711756. On April 13, 2006, the Michigan

Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See*

*People v. Storey*, No. 128741 (Mich. Sup. Ct. Apr. 13, 2006).

### C. The Pending Habeas Petition

Petitioner filed the pending habeas corpus petition on July 14, 2006. His grounds for

relief read:

> I.    Petitioner had ineffective assistance of [trial] counsel. He demonstrated "prejudice" and the Michigan Courts' decision is contrary to and an unreasonable application of clearly established federal constitutional law.
>
> II.   Petitioner was deprived of the right to confront witnesses and the right to a fair trial by the trial court's refusal to allow discovery of promises made to prosecution witnesses in return for their testimony.
>
> III.  Petitioner was deprived of a fair trial by prosecutorial misconduct in regard to discovery, in failing to disclose important evidence to the defense and in other respects.
>
> IV.   Petitioner was deprived of the right of confrontation by the trial court's ruling precluding important cross-examination regarding prior inconsistent statements.
>
> V.    Petitioner was denied the right of confrontation and due process by leading questions asked by the prosecutor of a witness.
>
> VI.   Petitioner was deprived of the right to present a defense and confrontation when the trial court precluded important cross-examination of a police officer.
>
> VII.  The trial court's findings of fact were clearly erroneous and denied Petitioner due process of law.

VIII.  The Michigan courts improperly substituted their judgment for the factfinder's judgment in evaluating newly discovered evidence, contrary to Petitioner's Sixth Amendment right to have the factfinder evaluate the evidence.

IX.  The cumulative effect of all errors violated Defendant's due process right to a fair trial.

## II. STANDARD OF REVIEW

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claim on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.

6

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original). Furthermore, section "2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted).

## III. DISCUSSION

### A.  Trial Counsel

Petitioner alleges that he was deprived of his constitutional right to effective assistance of trial counsel due to his attorney's deficient performance.  Specifically, Petitioner alleges that his attorney failed to prepare adequately for trial, failed to obtain valuable discovery, and failed to acquire information about prosecution witnesses, particularly David Kidd's deal with the prosecution.  The Michigan Court of Appeals adjudicated Petitioner's ineffectiveness claim on the merits and concluded that counsel's performance did not prejudice the defense and, therefore, Petitioner's trial attorney was not ineffective.  This Court agrees for reasons set forth below.

### 1.  *Strickland v. Washington*

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law'" for purposes of evaluating ineffective-assistance-of-counsel claims.  *Williams*, 529 U.S. at 391.  Pursuant to *Strickland*, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance

prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness" and if counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687-88. The prejudice prong of *Strickland* requires Petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Unless a defendant makes both showings [deficient performance and prejudice], it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

In a federal habeas action, judicial scrutiny of defense counsel's conduct is "doubly deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (*per curiam*). A habeas petitioner must establish a violation of *Strickland's* two-pronged test and show that the state applied *Strickland* in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

### 2. Preparation for Trial

Petitioner contends that his trial attorney was not prepared for trial, and the record tends to support the conclusion that trial counsel was either unprepared or disorganized. For example, in his opening statement, defense counsel stated that the charges against Petitioner's co-defendants (Shawn Coats and Anthony Whitlow) had been dismissed, but he was unable to tell the trial court how that was pertinent. (Tr. July 30, 1986, at 14.) Counsel also did not know whether Petitioner was wearing a cast on his leg at the time of the crimes (*id*. at 16) even though Darin Henderson testified that, after hearing two gunshots, he saw Petitioner leave the Gold Mine and run away. Defense counsel was unable to locate Thomas Brown's witness statement

8

(*id*. at 74), and counsel was uncertain about whether his investigator had obtained a subpoena for Police Officer David Kramer, whose testimony he apparently thought might contradict James Floyd's testimony. (Tr. Aug. 13, 1986, at 363.) Petitioner contends that counsel's uncertainty and faltering on these matters was symptomatic of a fundamental failure to prepare for trial and to bring knowledge and skill to bear on the case.

The Michigan Court of Appeals was not convinced that Petitioner was prejudiced by defense counsel's apparent faltering. This Court agrees that, even if defense counsel's performance was deficient, the deficient performance did not prejudice the defense. When counsel said that he did not know why it was pertinent that the cases against Shawn Coats and Anthony Whitlow were dismissed, the trial court stated that it knew what to disregard and what to take into consideration. The implication was that the court would not consider irrelevant information when making its final decision in the case.

Defense counsel's uncertainty about whether Petitioner was wearing a cast on the day of the crime was cleared up when Petitioner and his mother testified. Petitioner testified that he had been in an accident and could not run at the time of the robbery/murder because he was in a body cast and his leg had not healed. He claimed that he was using a crutch at the time. (Tr. Aug. 6, 1986, at 351-52.) His mother, Ruth Storey, identified photographs of Petitioner in a body cast in 1984. (Tr. Aug. 13, 1986, at 364-66.)

Defense counsel did not know whether his investigator brought a subpoena for Police Officer David Kramer, but counsel ultimately waived Kramer as a witness. (*Id*. at 399.) Defense counsel waived Thomas Brown as a witness after receiving a copy of Brown's statement and concluding that Brown's testimony would be cumulative to James Cassar's

9

testimony.  (Tr. July 30, 1986, at 82-83.)

Petitioner contends that defense counsel had no coherent defense.  While the defense theory may not have been obvious at the commencement of the case, defense counsel ultimately tried to try show that someone else committed the crime and that Petitioner was falsely accused. Counsel argued in his opening statement that James Floyd's offer of a $3,000 reward colored the proceedings and that Darin Henderson's testimony would not be credible because Henderson wanted the reward.  (Tr. July 30, 1986, at 13-14.)  Defense counsel tried to point out that the testimony of other key prosecution witnesses was not credible because the testimony was based on what the witnesses had heard from other people.  For example, defense counsel elicited testimony that James Floyd did not know Petitioner at the time of the robbery/murder and that he learned Petitioner's name from neighborhood youth.  (Tr. Aug. 5, 1986, at 116.)  Defense counsel brought out that Williams Walls did not make a statement to the police until over a year after the crime and that his statement was based on what he had heard from other people.  (*Id.* at 151, 155-60, 171-72.)  Counsel tried to elicit testimony from Darin Henderson and David Kidd that both of them were relying on rumors that the victim was shot twice in the head.  (Tr. Aug. 6, 1986, at 223, 282.)  The Court concludes for all the reasons given above that defense counsel presented a viable defense and that his alleged lack of preparation did not prejudice the defense.

### 3. Discovery

Petitioner contends that his attorney failed to obtain valuable discovery and failed to file a discovery order.  Petitioner's previous attorney, however, filed a discovery order, and the trial court gave defense counsel time to review the file.  The court also ordered rediscovery of the prosecutor's complete file and appointed an attorney to monitor the discovery proceedings.  (Tr.

10

Aug. 5, 1986, at 166, 181-4.)  Thus, there was no prejudice as the result of the initial failure to obtain discovery.

Next, Petitioner alleges that defense counsel lacked information about a potential witness, who supposedly gave a statement to the police on the same day as William Walls. Walls, however, testified that the person did not go inside the police station and make a statement.  (Tr. Aug. 5, 1986, at 167-68.)

Finally, Petitioner points out that defense counsel did not have Darin Henderson's letter to James Floyd.  Although defense counsel initially lacked a copy of Henderson's letter to Floyd, he must have acquired a copy of the letter during trial, because the letter was admitted in evidence (Tr. Aug. 6, 1986, at 289), and he cross-examined Henderson on the contents of the letter (*id*. at 235, 247-48, 258).  He also mentioned the letter during closing arguments.  (Tr. Aug. 13, 1986, at 415.)  The Court concludes that, even though defense counsel apparently did not obtain full discovery before trial, he ultimately received discovery, and Petitioner was not prejudiced by the initial lack of discovery.

### 4.  Information about Prosecution Witnesses

Petitioner alleges that his attorney should have obtained information about an agreement that David Kidd had with the prosecution to testify at Petitioner's trial in return for favorable treatment in Kidd's criminal case.  Defense counsel did request discovery regarding any promises made to Kidd, but the prosecutor stated that he made no promises to Kidd and that he did not know what the officer in charge of Kidd's case may have said to Kidd.  (Tr. Aug. 13, 1986, at 374-75.)  Kidd testified that no one promised him anything for his testimony against Petitioner (Tr. Aug. 6, 1986, at 266-67), and there is no evidence of an agreement to provide

favorable treatment to Kidd in return for his testimony at Petitioner's trial. Kidd's plea bargain in his own criminal case required him to testify against his co-defendants in return for having certain charges dismissed or reduced and a sentence within the guidelines. *See* Brief in Support of Habeas Petition, App. 10.

At Kidd's sentencing on August 28, 1986, the prosecutor mentioned that Kidd had provided assistance in Petitioner's case and appeared to have been an honest and truthful witness in Petitioner's case. Kidd then informed the sentencing judge that he still had to testify against Anthony Whitlow and Shawn Coats, who were Petitioner's co-defendants. Kidd's attorney asked the sentencing judge to have the officers in Petitioner's case apprise the court when Kidd had completed his involvement in the cases. *See* Brief in Support of Habeas Pet., App. 12, at 6, 11-12. These comments at Kidd's sentencing suggest that Kidd did agree to testify for the prosecution in Petitioner's case. However, there is no evidence of a promise to show leniency to Kidd in return for his testimony at Petitioner's trial. Kidd pleaded guilty before talking to the police about Petitioner's case. Thus, there does not appear to have been any favorable discovery for defense counsel to obtain.

### 5. Prejudice

According to Petitioner, the state appellate court's conclusion that he suffered no prejudice from defense counsel's deficient performance was contrary to the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the prejudice prong of the two-part test for ineffective assistance of counsel requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Michigan Court of Appeals stated that

12

Petitioner was required to show that the trial court would have acquitted him but for defense counsel's errors.  This was incorrect, but the court of appeals also cited *Bell v. Cone*, 535 U.S. at 695, and stated that, to establish ineffective assistance of counsel, a defendant has to show "a reasonable probability that, but for counsel's error, the result of the proceedings would have been different, and that the resultant proceedings were fundamentally unfair or unreliable."  *Storey*, 2005 WL 711756, at *2.  The court of appeals then went on to show how defense counsel's performance did not prejudice the defense.

This Court agrees for the reasons given above and in light of the overall strength of the evidence against Petitioner that, while defense counsel's performance may have been deficient, counsel's deficiencies did not prejudice the defense.  Before the robbery/murder, Petitioner told Darin Henderson and David Kidd that the victim was an easy target.  Darin Henderson testified that he saw Petitioner emerge from the Gold Mine shortly after Henderson heard two gunshots.  Later that day, Petitioner called Henderson and said that he had money.  Petitioner subsequently admitted to Henderson, William Walls, and David Kidd that he shot the man at the Gold Mine.  A few weeks after the robbery/murder, Petitioner tried to sell a gold chain taken during the robbery to James Floyd, the owner of the Gold Mine, and Petitioner informed the police that he was behind the plexiglass at the Gold Mine on the day of the robbery/murder.

The Court's confidence in the outcome of this case is not undermined by defense counsel's alleged deficiencies, because there is no reasonable probability that the result of the proceeding would have been different had it not been for counsel's unprofessional errors.  The state court's decision was not contrary to, or an unreasonable application of, *Strickland*.  Therefore, Petitioner is not entitled to relief on the basis of his ineffective-assistance-of-counsel

claim.

   **B.  Denial of Discovery of an Agreement
        between the Prosecution and David Kidd**

   The second habeas claim concerns prosecution witness David Kidd, who pleaded guilty

to robbery and second-degree murder in unrelated cases and was awaiting sentencing at the time

of Petitioner's trial.  While awaiting sentencing, Kidd provided the police with information about

other cases, including Petitioner's case.  During Petitioner's trial, his attorney requested

discovery regarding any agreements between Kidd and the prosecution.  The trial court denied

counsel's request.  (Tr. Aug. 13, 1986, at 374-76.)  Petitioner claims that the court's refusal to

allow discovery on this issue deprived him of his right to a fair trial and his right to confront

witnesses because he was unable to show that Kidd had a motive to fabricate his testimony.

   The record demonstrates that the trial court mistakenly thought defense counsel was

asking it to determine whether any promises were made to David Kidd to persuade him to testify

against his co-defendants.  (*Id*. at 375.)  The Michigan Court of Appeals nevertheless stated that

any error in denying defense counsel's discovery request was harmless.

   This Court agrees with the Michigan Court of Appeals, because there is no evidence that

Kidd was promised anything for his testimony at Petitioner's trial.  Kidd pleaded guilty late in

1985.  Although he was not sentenced until a few weeks after Petitioner's conviction in August

of 1986, he pleaded guilty before talking to the police about Petitioner.  (Tr. Aug. 6, 1986, at

276-77.)  While it is true that the prosecutor in Kidd's case commended Kidd at his sentencing

for testifying honestly and truthfully at Petitioner's trial, Kidd testified at Petitioner's trial that he

was not promised anything for the testimony.  And at the post-conviction hearing, Kidd testified

14

that he was sentenced to life imprisonment.[4]  While he had hoped to get a lighter sentence for testifying at Petitioner's trial, he maintained that he did not benefit from testifying for the prosecution.  (Tr. Mar. 11, 1998, at 48, 51-53.)

To summarize, it does not appear that discovery would have produced evidence of an agreement to treat David Kidd more favorably in return for his testimony in Petitioner's case. Even if Petitioner could have impeached Kidd with evidence of an agreement to testify against Petitioner, there was substantial evidence implicating Petitioner in the crime apart from Kidd's testimony.  Petitioner informed Darin Henderson that he shot Nathan Wilson, and he implicated himself when talking to William Walls.  He also tried to sell a gold chain that was taken during the robbery.

The alleged constitutional errors could not have had "a substantial and injurious effect or influence" on the trial court's decision.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Therefore, the state court's finding of harmless error was objectively reasonable.

### C.  The Prosecutor

The third habeas claim alleges that Petitioner was deprived of a fair trial by prosecutorial misconduct.  Respondent argues that Petitioner's prosecutorial-misconduct claims are procedurally defaulted because Petitioner did not object at trial and the Michigan Court of Appeals relied on his failure to object.  A federal habeas court need not address a procedurally defaulted issue before deciding against a petitioner on the merits.  *Mahdi v. Bagley*, 522 F.3d

---

[4]  The prosecutor recommended a sentence of seventeen to fifty years, but Kidd's attorney requested life imprisonment in the belief that a person sentenced to life imprisonment would be eligible for parole in ten years.  (Tr. Mar. 11, 1998, at 48-49.)

631, 635 (6th Cir. 2008) (quoting *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)), *cert. denied*, __ U.S. __, 129 S. Ct. 1986 (2009). The Court therefore will excuse the alleged procedural defaults and proceed to address the merits of Petitioner's prosecutorial-misconduct claims.

### 1. Failure to Disclose Evidence

#### a. The Alleged Agreement between the Prosecutor and David Kidd

Petitioner claims that the prosecutor did not disclose the fact that (1) David Kidd was promised leniency in his own murder case in return for his testimony in Petitioner's case, (2) Kidd falsely accused two boys in his own murder case, and (3) Kidd misstated the bargain he negotiated in his own case. In addition, Petitioner alleges that the prosecutor failed to disclose witness statements and failed to produce a police officer who was crucial to the defense.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three components to a true *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). "Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *O'Hara v. Brigano*, 499 F.3d 492, 503 (6th Cir. 2007) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Petitioner's *Brady* claim fails because he has not shown that the prosecutor withheld

16

material evidence favorable to the defense.  There is no evidence in the record of a promise to

grant leniency to David Kidd in return for his testimony at Petitioner's trial.  The mere fact that

Kidd desired or even expected favorable treatment in return for his testimony against Petitioner

is insufficient; "there must be some assurance or promise from the prosecution that gives rise to

a *mutual* understanding or tacit *agreement*."  *Akrawi v. Booker*, 572 F.3d 252, 263 (6th Cir.

2009) (emphasis in original).  Because there is no evidence that David Kidd was promised

anything for his testimony against Petitioner, there was nothing for the prosecutor to disclose.


### b.  Kidd's False Accusations

Petitioner argues that the prosecutor had a duty to learn that David Kidd falsely accused

two boys by the name of Marcus and Mark in Kidd's co-defendants' cases.  Kidd's case,

however, was handled by another prosecutor, and the prosecutor had no obligation to discover

exculpatory evidence for Petitioner.  As explained by United States Magistrate Judge Ellen S.

Carmody in *Lee v. Renico*, No. 5:05-cv-44, 2007 WL 748464, at *17 (W.D. Mich. Jan. 25, 2007)

(unpublished), Report & Recommendation Adopted, *Lee v. Renico*, 2007 WL 756318 (W.D.

Mich. Mar. 7, 2007):

> A state prosecutor is only obligated under the United States Constitution to
> disclose to a defendant exculpatory evidence of which he is aware.  *Brady v.
> Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).  There is no
> corresponding constitutional duty to fully investigate a defendant's theory of the
> crime or to seek out such evidence.  Even under state-law principles, neither the
> prosecutor nor the police have an affirmative duty to investigate on a defendant's
> behalf, or to seek and find exculpatory evidence.  *People v. Burwick,* 450 Mich.
> 281, 537 N.W.2d 813, 816 n. 10 (Mich. 1995); *People v. Sawyer,* 222 Mich. App.
> 1, 564 N.W.2d 62, 65 (Mich. Ct. App.1997).
>
> Furthermore, Kidd's testimony in his co-defendants' cases should have been available to

17

Petitioner.  "*Brady* does not apply when the information is available from another source . . . ." *Owens v. Guida*, 549 F.3d 399, 418 (6th Cir. 2008) (citing *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007)), *petition for cert. filed*, 78 U.S.L.W. 3066 (U.S. July 27, 2009) (No. 09-130).

### c.  David Kidd's Plea Agreement

Petitioner faults the prosecutor for not correcting Kidd's statement of the bargain he received in his own criminal case.  Petitioner states that, in one case, the prosecution dismissed a felony firearm charge, and in another case, the prosecution promised to reduce an armed robbery charge to unarmed robbery and agreed to dismiss charges of assault with intent to murder, armed robbery, and felony firearm.

Kidd did not provide all the details of his plea agreement at Petitioner's trial, although he did say that he was permitted to plead guilty to second-degree murder and promised a sentence within the sentencing guidelines.  Even if the terms of Kidd's plea bargain in his unrelated cases were understated, the undisclosed evidence was not material evidence.  There is not "'a reasonable probability' that the outcome of the trial would have been different if the evidence [of dismissed and reduced charges] had been disclosed."  *Pudelski v. Wilson*, __ F.3d __, __, No. 07-3856, 2009 WL 2475427, at *15 (6th Cir. Aug. 14, 2009).  Petitioner has failed to state a *Brady* claim.

### 2.  Other Misconduct

Petitioner says that the prosecutor committed additional misconduct by:  (1) failing to provide the defense with Thomas Brown's statement and other documents; (2) failing to produce Officer Kramer; and (3) failing to give Darin Henderson's letter and other documents to defense counsel.  "Claims of prosecutorial misconduct are reviewed deferentially on habeas review."

18

*Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). To prevail on his claim, Petitioner must demonstrate that the prosecutor's conduct deprived him of a specific constitutional right or infected his trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The misconduct must be "'so egregious as to render the entire trial fundamentally unfair.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

Courts must first ask whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley,* 457 F.3d 501, 515-16 (6th Cir. 2006), *cert. denied*, 551 U.S. 1134 (2007). If the conduct or remarks were improper, a reviewing court must consider whether the improper acts were so flagrant as to warrant reversal. *Id.* at 516. Prosecutorial-misconduct claims also may be reviewed for harmless error. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

The record does not support Petitioner's allegations of prosecutorial misconduct. The prosecution (Police Officer Thomas Day) provided defense counsel with a copy of Thomas Brown's statement during trial (Tr. July 30, 1986, at 74), and the trial court ordered defense counsel, not the prosecutor, to subpoena Police Officer David Kramer. (Tr. Aug. 6, 1986, at 358.) Ultimately, defense counsel waived both Brown and Kramer. (July 30, 1986, at 82-83 (Brown); Tr. Aug. 13, 1986, at 399 (Kramer)).

It also appears that the prosecutor provided defense counsel with Darin Henderson's letter to James Floyd. The letter was admitted in evidence (Tr. Aug. 6, 1986, at 204 and 289), and although defense counsel did not have the letter in time to cross-examine Floyd about it, he was able to use it during his cross-examination of Henderson and during closing arguments. The Court concludes that the prosecutor's conduct was not improper and even if it were improper, the

19

misconduct was harmless.

### D.  The Right of Confrontation

The fourth, fifth, and sixth habeas claims allege that Petitioner was deprived of his right to a fair trial and his right to confront the witnesses against him.  Specifically, Petitioner claims that (1) the trial court precluded important cross-examination of James Floyd; (2) the prosecutor asked leading questions; and (3) the trial court precluded important cross-examination of a police officer.

The Sixth Amendment, which is applicable to the States, *Melendez-Diaz v. Massachusetts*, __ U.S. __, __, 129 S. Ct. 2527, 2531 (2009), "guarantees to a criminal defendant the right 'to be confronted with the witnesses against him.'"  *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006).  "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*) (emphasis in original).  "Where the trial court limits the extent of cross-examination, the inquiry for the reviewing court is 'whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory.'"  *Stewart v. Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (quoting *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989)).

Constitutional errors, including Confrontation Clause errors, can be harmless.  *Hedgpeth v. Pulido*, __ U.S. __, __, 129 S. Ct. 530, 532 (2008); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  The test on habeas review of constitutional errors is whether the error had a "substantial and injurious effect or influence" on the jury's verdict.  *Brecht*, 507 U.S. at 623.

This assessment of the prejudicial impact of constitutional error in a state-court criminal trial applies to all non-structural errors on collateral review, *Ruelas v. Wolfenbarger*, __ F.3d __, __, No. 08-1571, 2009 WL 2851374, at *6 (6th Cir. Sept. 8, 2009), "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1967)]." *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

### 1. Prior Inconsistent Statements

Petitioner alleges that he was deprived of his right to confront the witnesses against him when the trial court refused to allow him to question James Floyd about Darin Henderson's letter to Floyd. In the letter, Henderson stated that Anthony Whitlow killed the victim and that Henderson needed money and a place to stay. The letter did not say that Petitioner was in the Gold Mine at the time of the crime.

The Michigan Court of Appeals ruled that any error in Petitioner's right to confront James Floyd was harmless. Petitioner argues that the error was not harmless because he was unable to cross-examine Floyd about the effect of the letter on him, his decision to pay a reward, and his relationship to Henderson. However, during the prosecutor's direct examination of James Floyd, Floyd testified regarding his offer of a reward for information about the perpetrator of the crimes. He also testified about the impact of Henderson's letter on him. He stated that he had explained to Petitioner in Henderson's presence that there was a $2,000 reward for information leading to the arrest and conviction of the person who shot and killed Nathan Wilson.[5] One or two days later, Henderson left a letter with one of Floyd's employees. The

---

[5] On cross-examination, Floyd stated that he may have increased the reward to $3,000 (Tr. Aug. 5, 1986, at 123.)

letter outlined the details of the murder.  Floyd subsequently gave the information to Officer

Kramer, who suggested that Floyd call Henderson to determine whether Henderson would talk.

Henderson then contacted Floyd and informed both Floyd and the police what he knew about the

incident.  (Tr. Aug. 5, 1986, at 113-14.).  Henderson's letter to Floyd was admitted in evidence at

trial, and defense counsel was able to cross-examine Henderson about it and about the reward.

Given these facts, the Court finds that the limitation placed on defense counsel's cross-

examination of James Floyd could not have had a substantial and injurious effect or influence on

the trial court's verdict.  Therefore, the state appellate court's finding of harmless error was

objectively reasonable.

## 2.  Leading Questions

Darin Henderson testified at trial that he saw Shawn Coats sitting on a flower pot in front

of the Gold Mine shortly before he saw Petitioner and Anthony Whitlow exit the Gold Mine.

This testimony differed from Henderson's testimony at the preliminary examination where he

testified that he saw Coats come out of the Gold Mine with Petitioner and Anthony Whitlow.

Petitioner contends that the prosecutor used leading questions to elicit testimony consistent with

Henderson's testimony at the preliminary examination and that the leading questions deprived

him of due process and his right to confront the witnesses against him.  The Michigan Court of

Appeals stated on review of this claim that reversal was not required because Petitioner failed to

demonstrate that he was prejudiced by the leading statements.

Although leading questions are not *per se* improper in Michigan, they "should not be

used on the direct examination of a witness except as may be necessary to develop the witness'

testimony."  Michigan Rule of Evidence 611(c)(1).  The violation of state law is not a basis for

22

habeas relief, *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and the prosecutor's use of leading questions did not deprive Petitioner of his right to confront the witnesses against him. He had ample opportunity to cross-examine Henderson about inconsistencies in his testimony. "The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).

### 3. Precluding Testimony

#### a. Officer Day's Investigative Report

Petitioner alleges that the trial court deprived him of his right to confront witnesses and his right to present a defense when the court precluded him from asking Officer Kenneth Day about Day's investigative report. The report indicated that two gunshots were fired, whereas the medical examiner testified that Nathan Wilson was shot three times. Petitioner claims that questioning Officer Day about his report was important because key prosecution witnesses testified that Petitioner admitted to firing "two to the [victim's] head." According to Petitioner, this testimony was an indication that the witnesses were relying on rumors, not personal knowledge of what happened.

The Michigan Court of Appeals reviewed Petitioner's claim for "plain error" because defense counsel failed to make an offer of proof about the excluded evidence. Even if the claim is not procedurally defaulted, the alleged error was harmless because the trial court was made aware of the discrepancy regarding the number of gunshots. The court also was made aware of Petitioner's theory that prosecution witnesses were merely repeating street talk.

#### b. Evidence of Another Robbery/Murder

Petitioner contends that the trial court deprived him of his right to confront witnesses and

his right to present a defense when the court precluded him from asking Officer Day about a robbery/murder at another Gold Mine shop.  Petitioner wanted to show that the real killer was the perpetrator of the other robbery/murder.  The Michigan Court of Appeals rejected Petitioner's claim, because Petitioner was not prevented from presenting the spirit of his defense.

Excluded evidence violates the right to present a defense only if the exclusion is arbitrary or disproportionate to the purpose it was designed to serve or infringes on a weighty interest of the accused.  *United States v. Scheffer,* 523 U.S. 303, 308 (1998).  As explained by the Supreme Court in *Holmes v. South Carolina*, 547 U.S. 319 (2006),

> [w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury . . . . [T]he Constitution permits judges "to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' "

*Id*. at 326-27 (citations omitted).  "Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crimes, not mere speculation on the part of the defendant." *DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001).

Petitioner did not set forth any specific allegations demonstrating that someone else was the real killer.  Therefore, his right to present a defense was not violated.  Even if the right to present a defense were violated, the constitutional error could not have had a substantial and injurious effect on the trial court's verdict, given the considerable evidence linking Petitioner to the crime.  The alleged constitutional error, therefore, was harmless.

24

**E.  The Trial Court's Findings of Fact**

The seventh habeas claim challenges the trial court's findings of fact.  Petitioner alleges that the trial court mis-read the evidence and was confused about Petitioner's testimony when it evaluated Petitioner's credibility.  The Michigan Court of Appeals held that, although the trial court made one error in its findings of fact, the findings were not clearly erroneous.

A state court's findings of fact or determination of a factual issue is entitled to a presumption of correctness unless the habeas petitioner can rebut the presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004).  "With respect to § 2254(d)(2), '[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  In addition, section "2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).  The issue is whether the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

The trial court determined that Petitioner was not credible, in part, because he claimed that he could have sold a gold ring to the Gold Mine for $12 to $15, but then decided not to sell the ring and to borrow $10 instead.  (Tr. Aug. 13, 1986, at 438.)  Petitioner contends that the trial court mis-read the evidence and erroneously concluded that James Floyd had authorized Nathan

25

Wilson to buy the gold ring from Petitioner for the asking price and that Petitioner then rejected the price he had suggested.

Petitioner admitted at trial that he had informed the police that James Floyd agreed to give him the amount of money he requested for the gold ring. (Tr. Aug. 6, 1986, at 339.) Thus, the trial court's finding that it was inconsistent for Petitioner to reject his asking price of $12 to $15 and then borrow $10 was not clearly erroneous.

The trial court also stated that Petitioner's trial testimony was not credible because Petitioner denied being behind the plexiglass partition that separated the customer area of the Gold Mine from the area where Nate Wilson conducted business.   (Tr. Aug. 13, 1986, at 438-39.)  This was an erroneous finding of fact, because Petitioner admitted to the police and at trial that he went behind the plexiglass partition on the day of the crime. (Tr. Aug. 6, 1986, at 317, 353-54.)  Nevertheless, the trial court's conclusion that Petitioner was not a credible witness is entitled to deference, *Lonberger*, 459 U.S. at 434, and the trial court's conclusion that Petitioner was one of the perpetrators of the crime was based on a reasonable determination of the facts. Petitioner mentioned to people before the robbery/murder that Nathan Wilson would be an easy target.  In addition,

> [a]n eyewitness saw [Petitioner] in the shop at the time of the robbery and murder. [Petitioner's] fingerprint was found on the telephone, indicating that he was behind the Plexiglas partition. [James] Floyd recognized a stolen necklace that [Petitioner] sold to him after the robbery and murder, and [Petitioner] admitted his involvement in the robbery and murder to three people.

*Storey*, 2005 WL 711756, at *12.  The Court concludes that the trial court's determination of the facts was reasonable, and the state appellate court's conclusion – that the trial court's findings were not clearly erroneous – was not contrary to Supreme Court precedent.

### F.  Evaluation of Newly Discovered Evidence

During post-conviction proceedings, Petitioner presented the state court with evidence that Darin Henderson and David Kidd lied when they testified for the prosecution at trial and that James Floyd paid Darin Henderson $3,000 for his trial testimony.  Petitioner also presented a new witness, Myron Nelson, who testified at the post-conviction evidentiary hearing that he saw three men, who did not resemble Petitioner, run out of the Gold Mine.  Petitioner alleges that the judges who reviewed his claims during post-conviction proceedings substituted their judgments for the trial court's judgment when reaching the conclusion that Henderson and Kidd's recantation testimony was suspect.  Petitioner argues that the new evidence raises significant doubt about the verdict in his case, such that there can be no confidence in the result of his trial.

A reviewing court may not substitute its judgment for that of the finder of fact.  *United States v. Marshall*, 248 F.3d 525, 545 (6th Cir. 2001).  In this case, however, the Michigan Court of Appeals deferred to Judge Hathaway's appraisal of the credibility of the recanting witnesses, and Judge Hathaway deferred to Judge Chylinski's determination of the credibility of trial witnesses.  The state courts therefore did not substitute their judgments for the judgment of the trial court.

Petitioner seeks to have this Court find that the witnesses' testimony at the evidentiary hearing was credible and their trial testimony was incredible.  This Court, however, must defer to Judge Hathaway's determination that the recantation testimony was not credible, *Lonberger*, 459 U.S. at 434, and the Supreme Court has stated that a claim of actual innocence "is not itself a constitutional claim."  *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Even if it were a cognizable claim, "the threshold for any hypothetical freestanding innocence claim [is]

27

'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera*, 506 U.S. at 417). The petitioner must show that, more likely than not, no reasonable juror would have convicted him in light of the new evidence. *Ross v. Berghuis*, 417 F.3d 552, 556 (6th Cir. 2005) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Stated differently, the petitioner must show that, "in light of the new evidence . . . , more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

Although David Kidd and Darin Henderson testified at the evidentiary hearing that their trial testimony was untrue, William Walls did not testify at the hearing, nor recant his trial testimony that Petitioner admitted to killing a man at the Gold Mine. Furthermore, Gloria Rozier testified at the evidentiary hearing that, according to school records, Myron Nelson was in school on the day that he claimed to have observed three men, none of whom was Petitioner, run out of the Gold Mine. James Floyd testified at the evidentiary hearing that he paid Darin Henderson $3,000 as a reward for information leading to a conviction in the case. Floyd claimed that, after Petitioner's conviction, Henderson sent him letters indicating that he was afraid of Petitioner and that he (Henderson) needed help in acquiring protective custody while he was confined in jail. According to Floyd, Henderson's letters implied that Petitioner had threatened him. (Tr. June 3, 1999, at 23-27, 37.)

This case is not one of the rare and extraordinary cases in which a claim of actual innocence warrants a new trial. Petitioner therefore has no right to relief on the basis of his allegations of newly discovered evidence.

### G. Cumulative Effect of Errors

The ninth and final habeas claim alleges that the cumulative effect of all the errors

violated Petitioner's right to a fair trial and requires reversal of his convictions.  The Michigan

Court of Appeals found no merit in this claim because Petitioner was not prejudiced by any

errors.  This Court finds no merit in Petitioner's claim because "[t]he Supreme Court has not

held that distinct constitutional claims can be cumulated to grant habeas relief."  *Lorraine v.*

*Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  Therefore, it cannot be said that the state court's

decision was contrary to Supreme Court precedent.  Constitutional errors that would not

individually support habeas relief simply cannot be cumulated to support habeas relief.  *Moore v.*

*Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

## IV.  CONCLUSION

The state appellate court's rejection of Petitioner's claims did not result in a decision that

was contrary to, or an unreasonable application of, Supreme Court precedent.  Accordingly, the

petition for writ of habeas corpus (Dkt. #1) is **DENIED**.


s/John Corbett O'Meara
United States District Judge


Date:  September 17, 2009



I hereby certify that a copy of the foregoing document was served upon the parties of
record on this date, September 17, 2009, using the ECF system and/or ordinary mail.


s/William Barkholz
Case Manager

**APPENDIX**

Statement of Facts, as summarized in *Storey v. Price*,
No. 01-74092, at 2-5 (E.D. Mich. Sept. 18, 2003)

Darlene Holley testified that she and her sister, Marlene, went to the Gold Mine Jewelry store on the afternoon of November 7, 1984. They entered the customer area, which was separated from the employee area of the store by plexiglass. Ms. Holley looked through the plexiglass and saw Mr. Wilson slumped over in a chair. She banged on the plexiglass in a futile effort to rouse Mr. Wilson. They then left the store and telephone her sister, who telephoned. Mr. Wilson's mother.

Police Officer Bobby Buckines testified that he was on patrol in the vicinity of the Gold Mine store on the afternoon of November 7, 1984, when he was flagged down by a pedestrian, Roger Solomon. Mr. Solomon informed him that a man was slumped in a chair inside the Gold Mine store. Officer Buckines went to the store and, through the plexiglass, observed Mr. Wilson slumped in a chair with blood trickling from his nose. Officer Buckines tired to open the door separating the public area from the employee area and found it to be unlocked. Officer Buckines testified that Mr. Wilson appeared to be deceased and to have suffered a gunshot wound to the back of his head.

Oakland County Chief Deputy Medical Examiner Dr. Lyndia Biedrzycki testified that she performed an autopsy on Nathaniel Wilson on November 8, 1984. She testified that Mr.

Wilson suffered three gunshot wounds to the head.

Darin Henderson testified that he knew Petitioner, Shawn Coats and Nathan Wilson.  On the day of the murder, Mr. Henderson was looking for Mr. Coats because Mr. Coats owed him money.  Mr. Henderson testified that he was across the street from the Gold Mine store when he saw Mr. Coats walk out of the store, and saw Petitioner and Anthony Whitlow inside the store.  Mr. Henderson observed Mr. Coats walk away from the store, and then heard two gunshots.  Petitioner and Mr. Whitlow then left the store.  Mr. Henderson further testified that three weeks later, Petitioner confessed to him that he had killed Mr. Wilson.

David Kidd testified that he was friends with Petitioner and that, sometime before the killing of Mr. Wilson, Petitioner commented that Mr. Wilson would be an easy target to rob.  Mr. Kidd also testified that, while he and Petitioner were incarcerated together at a youth home, Petitioner confessed to him that he had killed Mr. Wilson.

Dione McPherson testified that he went to the Gold Mine store on the day of the shooting at approximately 1:00 p.m.  In addition to Mr. Wilson, two men were in the employee area of the shop.  Mr. McPherson identified those men to be Petitioner and Mr. Coats.

James Floyd testified that he was the owner of the Gold Mine store.  Mr. Floyd opened the store on the morning of November 7, 1984.  When he opened the store, his employee, Nathaniel Wilson, was with him.  As part of his routine in opening the store, Mr. Floyd inventoried the gold and put money in the cash drawer.  On that day, there was approximately 220 grams of gold, with a retail value of approximately $10,000, and $1,000 in cash.  Mr. Floyd left the store at approximately 10:30 a.m.   At 2:15 p.m., Mr. Floyd repeatedly attempted to call the store, but, each time, received a busy signal.  The store's phone line was equipped with call-

31

waiting, so Mr. Floyd became suspicious and went to the store.  When he arrived, police were already there and he learned that Mr. Wilson had been shot.

Mr. Floyd inventoried the gold and found that about 200 grams were missing.  He was in the store two weeks later when Petitioner entered and attempted to sell him a gold chain and some other items.  Mr. Floyd recognized the gold chain as an item that had been stolen in the robbery.  He recognized it as being the same chain because he had repaired the chain the day before the robbery, replacing the chain's broken gold clasp with a silver one.

Mr. Floyd later offered a $2,000 reward for any information leading to the arrest and conviction of the person who killed Mr. Wilson.  Mr. Floyd personally informed Petitioner and Mr. Henderson of the reward.  Two days later, Mr. Floyd received a letter from Mr. Henderson in which he outlined what he knew about the murder of Mr. Wilson.  The letter identified Shawn Coats and Anthony Whitlow as having been involved in the murder, but did not mention Petitioner.

Williams Walls testified that a couple of months after the robbery and murder at the Gold Mine shop, he was at his sister's house, when Petitioner and another man stopped by to visit his sister.  Mr. Walls had met Petitioner a couple of times prior to that day.  The men began talking, and Petitioner stated that he shot a man at the Gold Mine shop.

Petitioner testified in his own defense.  He admitted to being at the Gold Mine shop on the day that Mr. Wilson was murdered.  He testified that he did not shoot Mr. Wilson and, when he left the store that day, he left Mr. Wilson unharmed.  Petitioner further testified that he had no knowledge of the murder.

32